280 P.2d 1053

Jewell BOARDMAN and H. J. Boardman, Jr., Plaintiffs-Appellees,

v.

R. M. KENDRICK (Helen Kendrick, C. K. Kendrick, Richard M. Kendrick, Jr., Gladys Stice, Orb Stice, Herbie S. Kendrick, Sammy K. Kendrick, and Richard M. Kendrick, Jr., Guardian of Sammy K. Kendrick and Herbie S. Kendrick, minors —Substituted Defendants, Heirs of R. M. Kendrick, Deceased), Defendants-Appellants.

No. 5822.

Supreme Court of New Mexico.
March 1, 1955.

G. T. Hanners, Howell Spear, Lovington, Hackney & Crawford, Brownfield, Tex., for appellants.

Hervey, Dow & Hinkle, C. R. Brice, William C. Schauer, Roswell, for appellees.

McGHEE, Justice.

As this appeal comes to us it involves mineral interests under lands, some of which were acquired under federal homestead laws, and others by purchase, by Jewell Boardman and her then husband as community property. The trial court decreed the plaintiffs, Jewell Boardman and her son H. J. Boardman, Jr., were the owners in fee simple of the following described mineral interests and quieted their title thereto:

All oil, gas and other minerals in and under the SE¼ and the E½ of SW¼ of Section 8; and the W½ of the SW¼ of Section 9; and an undivided ⅞ths of the minerals in and under the W½ of Section 10; all in Township 13 South, Range 38 East, N.M.P.M.

The circumstances giving rise to the present controversy date back over a considerable time. The Boardmans were indebted to the First State Bank of Plains, Texas, as the result of borrowing money for a period of years. In 1921 they had given a mortgage on one 320-acre tract to secure certain indebtedness and in 1925 the husband gave a mortgage to the bank on the other tract to secure indebtedness. The latter mortgage was not signed by the wife.

The bank went into voluntary liquidation with R. M. Kendrick as its liquidating agent, and, according to a finding of the trial court, he and H. J. Boardman entered into an oral contract in 1928 whereby it was agreed that Kendrick should foreclose the two mortgages, that he would hold title thereto as trustee, pay another mortgage debt to Kate W. Thurmond and pay all debts due Kendrick as liquidating agent; that Kendrick might lease the land for oil and sell all or any part thereof; and that all of said real property, if any, remaining after the debts were paid should be reconveyed by him to the Boardmans.

In the fall of 1928 Kendrick proceeded to sell the property under powers of sale contained in the mortgages, conveying it to himself individually. He sent the notices of sale to Boardman with the following letter:

"I have prepared, and forwarded to Lovington, the Necessary papers, to get 'Something Started' on your business, and am handing you herewith Copies of my letters, to the Printer, and Sheriff, and also a copy of the two

separate 'Notices of Sale' as the law requires in such cases.

"You will notice the amounts set forth in the Notice, aggregating $6,680.32, including Attorneys Fees, Foreclosure Fees, etc., but does not mean anything so far as you and I are concerned, and I only expect you to pay me the amount owing, with Interest, and the necessary costs of these proceedings, and this letter will be your receipt to that effect, if I should happen to 'Kick off', before the matter is wound up.

"It might be a good idea, for you to talk around, as though you was very unconcerned, as there was a 'Heavy Prior Lien' to the one I hold and thereby discourage any possible bidders on the stuff."

Only one notice of sale was posted instead of six, as required by the terms of the mortgage. Because of such fact and other irregularities, when Kendrick sold an oil and gas lease on the property in 1930, the examining attorneys noted numerous exceptions and, among other things, required the procurement of a quitclaim deed from the Boardmans to the west half of section 10. Such quitclaim deed was later given upon the promise made by Kendrick, as testified to by Mrs. Boardman, that he would reconvey the property to them when sufficient money was realized therefrom to pay what was owed on it.

The Boardmans continued in possession of the property after the execution of the quitclaim deed, just as they had occupied it before the foreclosure sale in 1928. Kendrick advised H. J. Boardman of the sale of the oil and gas lease in the following letter:

"Now don't Cuss when you read the information hereunder contained, for something had to be done, and 'Done Quick', for that lady who holds the 'Past Due' $2000.00 against the lands, was not going to be put off much longer.

"I have therefore Leased our 640 acres, and the 160 of my Ed McCormick tract, making 800 acres in all, to the Humble Oil & Refining Co., for a consideration of $2.50 per acre, on a ten year Commercial Lease, with a 50¢ annual Rental.

"I think under the circumstances, that we are extremely fortunate, in making the Deal, and I want you to help me get in behind the Abstracters, at Lovington, and get the Deal through at the earliest date possible.

"I believe that you told me, you had Abstracts to your stuff, and if so, I want you to get them Rounded-Up, and I will have mine brought down to date, and we will try and get the Deal closed at an early date.

"I would be glad if you could Run over so that we could check up and see just what we need to do."

On February 10, 1931, Kendrick wrote Boardman the following letter:

"Am still having H-1, trying to get that oil Lease closed, and it still keeps 'Banging Fire'.

"I just talked with Atwood, whom I understood you had employed in the matter, but he declares that he had no connection in the case whatsoever, and that he never at anytime talked with you concerning same.

"I am inclosing herewith Copy of a letter I have written to Mr. Hill, at Roswell, which is self explanatory."

Again, on February 23, 1931, Kendrick wrote Boardman as follows:

"Acknowledging receipt of your letter of the 22nd, if it is necessary in in order to keep the cattle from starving to death, we will handle the price of 2 tons of Cake, but I want you to come in at very earliest date possible and fix up for it.

"Glad that your wife is improving, and trust that she will soon recover entirely.

"Had a letter from the Abstract Company stating that they had secured Dismissal of the Suits, and sent the Supplemental Abstract to the Company at Roswell. Hope to get the matter closed at an early date."

After getting the title cleared and the remittance for the oil and gas lease, Kendrick wrote Boardman the following letter, dated February 27, 1931:

"Just a word to advise that I got the Oil Leases closed this evening, and received the check from the Roswell Bank, less $2.00 Exchange charged by them.

"I immediately mailed Draft to Mrs. Kate Thurmond covering the amount due her, which was $2218.33, and thanked her for her patience in the matter. She has certainly been mighty nice to us on the item.

"Come over at earliest date possible and we will get the matters straightened out. The Abstract Company at Lovington, is holding a Bill against us of something above $70.00, which looks mighty high to me."

Proper credits were given the Boardmans on their indebtedness to the Plains bank and they continued in possession of the property until the fall of 1933 when they moved to Quemado, New Mexico, to live with their son, the move being occasioned by the continued ill health of Jewell Boardman and the hard times then prevailing in Lea county. On October 15, 1933, Kendrick wrote the following letter to H. J. Boardman at his new address:

"Am writing to know what your intentions are with reference, to Leasing the place for the ensuing year?

"I was out in Lea County this week, and started down to the place, when I

happened to get into conversation with Mr. Dennis Rentfro, who told me that you were out at the address above shown, and had leased the place to him, conditionally.

"At the time I talked with you, and H. J. Jr., last, I understood that you desired to stay on the place yourselves.

"Please let me hear from you at your earliest convenience, concerning the matter, and oblige."

The last letter in evidence from Kendrick was addressed to Mrs. Jewell Boardman under date of May 4, 1934, as follows:

"Acknowledging receipt of your letter under date of April 20th. am handing you herewith Statement, of the Indebtedness of Mr. H. J. Boardman, and yourself, as previously rendered to Mr. Boardman under date of March 1st, 1931, which is self explanatory.

"To bring the transaction down to June 1st. of the current year, the total amount that would be owing to the Stock Holders of the old First State Bank of Plains, Texas, would be $8,556.34.

"On behalf of said stockholders, of said old First State Bank of Plains, we would be willing to take a loosing of $2,556.83, and sell you the place back, for $6,000.00."

On November 4, 1949, many years after H. J. Boardman had departed this life, Jewell Boardman wrote the following letter to Kendrick, but did not receive a reply:

"I guess you think I have been a long time writing or saying anything about this. But I am now an old woman and have no other support but to work doing housework and I thought if you could see your way clear. That I might have enough interest in the Boardman homestead as I did help live it out. And I can't help what Mr. Boardman done about it. As the land has got so valuable I thought maybe if you had got all your money back that you want out that I could get enough to live on out of it. Now I am not trying to start anything. I just thought it wouldn't hurt to ask and see and you will never know how much it will be appreciated."

In 1950 Jewell Boardman made oral demand on Kendrick for an accounting which he refused because, as she stated, he claimed her husband had not "done right" about the cattle on which Kendrick held a mortgage when he, Boardman, moved to Quemado. Shortly after the oral demand this suit was filed. Kendrick died a few months after filing of suit and his heirs were then made parties.

Included in the action to have Kendrick declared a trustee was a cause of action to quiet title to all of the lands and minerals and for an accounting. The suit was dis-

missed against one who had purchased the surface and one-eighth of the minerals on a part of the lands. The trial court quashed the service or dismissed the count in which it was asked that Kendrick be required to make an accounting on the ground service had been obtained on him outside the state of New Mexico.

The Kendrick heirs steadfastly refused to make any accounting but the plaintiffs were able to prove Kendrick had received in excess of $15,000 from the property. The trial court found he had been fully paid and we find substantial evidence to support the finding. The plaintiffs tendered any additional sums which the defendants could show were owing, but the latter stood mute to the tender; it is their fault if, in fact, the indebtedness is not paid in full.

A great deal is said in the briefs of defendants-appellants on the law of express trusts. It is strenuously contended there are not sufficient writings signed by Kendrick to avoid the seventh section of the Statute of Frauds which requires such trusts to be in writing, etc. Appellants rely principally on our case of Pitek v. McGuire, 1947, 51 N.M. 364, 184 P.2d 647, 1 A.L.R.2d 830, and its analysis of the law of the Statute of Frauds in New Mexico.

■ If it were true that the plaintiffs had to establish an express trust as their sole basis for recovery, the questions raised by appellants would be material; however, the decree is sustainable on other grounds—that the foreclosure proceedings and the quitclaim deed given by the Boardmans to Kendrick effected a mortgage, with the legal title to be reconveyed by Kendrick when the indebtedness against the property was discharged.

■ It has long been settled in New Mexico that a deed absolute in form may be shown by parol testimony to have been given as a mortgage. King v. Warrington, 1882, 2 N.M., Gild., 318; Alexander v. Cleland, 1906, 13 N.M. 524, 86 P. 425; Palmer v. City of Albuquerque, 1914, 19 N.M. 285, 142 P. 929, L.R.A.1915A, 1106; Turner v. New Brunswick Fire Ins. Co., 1941, 45 N.M. 126, 132, 112 P.2d 511.

The reasons underlying the allowance of parol proof in such cases have been variously described. In the early cases it is indicated the basis lay in fraud on the part of the grantee, or in mistake. In later cases, and probably generally today, such proof is permitted in arriving at the intention of the parties. 4 Pomeroy's Equity Jurisprudence (5th Ed.) § 1196.

Chapter 8 of 1 Jones on Mortgages (8th Ed.), entitled "Parol Evidence To Prove An Absolute Deed A Mortgage," contains a breakdown by states of the rules prevailing in all jurisdictions. Section 393 thereof reviews the cases, and states:

"A review of the cases, with reference to the grounds upon which parol

evidence is admitted to prove that an absolute conveyance is a mortgage in equity, will show that in the earliest cases, both in England and America, it was admitted solely upon the ground of fraud, accident, or mistake, which are ordinary grounds of equity jurisdiction. In several states this is still declared by the courts or by statute to be the only ground upon which their interference, in such case, can be justified; or, at any rate, there have been no decisions which distinctly place such interference upon any other ground. * * *

"In a few states * * * the intention of the parties to create a security only seems to be regarded as raising a trust in favor of the grantor which equity will enforce.

 *     *     *     *     *     *

"But the doctrine in this country, now generally accepted, is that the admission of parol evidence is not confined to cases of distinct fraud on the part of the grantee in obtaining a deed without a defeasance, or mistake on the part of the grantor in giving such a deed. The doctrine declared by the Supreme Court of the United States in Russell v. Southard, (12 How. (U.S.) 139, 13 L.Ed. [927]) and Peugh v. Davis, (96 U.S. 332, 24 L.Ed. [775]) and by the Supreme Court of Massachusetts in several cases, is, that the mere fact that an absolute deed was intended merely as security affords ground of jurisdiction to courts of equity to interfere and give relief; that a security in this form is so calculated to be an instrument of oppression and wrong as in itself to constitute a quasi fraud, which equity should relieve against; * * * This doctrine is declared with more or less distinctness in the later decisions of the courts of most of the states."

An interesting and informative comment in 34 Ill.L.Rev. 189 (1940), entitled "Oral Understandings at Variance with Absolute Deeds", examines the factors behind the permission of such parol testimony and discusses the apparent inconsistency in allowing this proof in the "mortgage" cases and refusing it in cases of "express trusts." This inconsistency has been sought to be explained by Professor Scott upon economic grounds—that the grantor in the "mortgage" cases is at the mercy of his grantee and will, in order to obtain funds, execute an absolute conveyance if the mortgagee-grantee demands it; on the other hand, there is no such economic compulsion in instances involving express trusts. 1 Scott on Trusts (1939 Ed.) § 44.3.

In any case, as noted above, the exception to the Statute of Frauds, if such it be, permitting parol proof in the case of these security transactions is of long recognition in New Mexico.

Possibly as a result of the early theory that fraud or mistake was involved in these transactions, there is considerable authority either holding or suggesting the grantee is a constructive trustee as to the balance of property remaining after the indebtedness which the deed secured has been paid. See cases collected in 35 A.L.R. 280, 306; 1 Scott on Trusts (1939 Ed.) § 44, at p. 250; Restatement, Restitution, § 182 and Comment on Clause (c) thereunder; 2 Jones on Mortgages (8th Ed.) § 1249; and 54 Am.Jur. (Trusts) § 231.

We do not believe the facts before us justify the raising of a constructive trust, as the appellees have admitted there was no element of fraud or overreaching on the part of Kendrick. As stated in New Mexico Potash & Chemical Co. v. Independent Potash & Chemical Co., 10, 1940, 115 F.2d 544, 547:

"A constructive trust is one which does not arise by agreement or from the intention of the parties, but by operation of law in order that justice may be effected in the most efficient manner. Such a trust may grow out of a variety of facts, but fraud, either actual or constructive, is an essential element and must always be present. * * * (Omitting citations.)"

We believe the true relation of appellants to the property here involved is best compared to a resulting trust which arises when an express trust has been fully performed without exhausting the trust res. The trustee then has assets in his hands which he is neither directed to keep, nor to turn over to another beneficiary. In such circumstances he holds the property upon a resulting trust for the settlor. 3 Scott on Trusts (1939 Ed.) § 404.1; 4 Pomeroy's Equity Jurisprudence (5th Ed.) § 1034.

It was argued to us that the equitable consideration upon which relief is given in cases such as this one is that of unjust enrichment and that this consideration is not present here as the indebtedness against the property at the time it was conveyed far exceeded its then value. This is probably true, but as already noted, Kendrick long ago received all he was entitled to under the established agreement of the parties and his heirs would be unjustly enriched if they were permitted to retain the property. That the present value of the minerals in the land is somewhat in the nature of a windfall to the Boardmans cannot militate against their equitable right to the return of the property.

The evidence is clear that Kendrick carried the balance of the indebtedness, with ten percent interest, against the lands for many years. Indeed, as late as May 4, 1934, and after Boardman had evidently had some kind of unpleasant experience with him, Kendrick still recognized the indebtedness of the Boardmans.

The appellants urge that because of this unpleasantness which undoubtedly

caused the Boardmans distress that if any trust existed it must have been repudiated by Kendrick so as to start the Statute of Limitations running, with the result the claim of the Boardmans is now barred. Aside from the fact some unpleasantness apparently occurred, the record is barren of what took place. The record is not sufficient to support the plea.

The appellants likewise claim the letter of May 4, 1934, set out supra, was a renunciation of any trust and certainly it started the running of the Statute of Limitations. We do not so regard this letter. On the contrary, we construe it as a recognition of the fact Kendrick had taken the conveyances as mortgages and that the indebtedness was still unpaid. It is true Kendrick offered to "sell" the property back to the Boardmans for $6,000, but in view of the prior relations between the parties and the balance of the letter, we believe the term "sell" was used to mean "reconvey," and we decline to recognize this letter as a repudiation of Kendrick's agreement to reconvey upon payment of the indebtedness. It is required that repudiation, to be effective, must be clearly asserted and unequivocal. White v. Mayo, 1926, 31 N.M. 366, 246 P. 910; McCallister v. Farmers Development Co., 1936, 40 N.M. 101, 55 P.2d 657; 54 C.J.S., Limitations of Actions, § 182b, (3).

Appellants next invoke § 20-2-5, 1953 Comp., our "deadman" statute, saying as Kendrick died before the trial, the claim of the plaintiffs was not corroborated as required by statute. The trial court found the claim was corroborated and appellants have not destroyed the finding, so it must stand. We have examined the record and find that while the claims may not be corroborated in every detail, the corroboration was sufficient under our holding in Union Land and Grazing Co. v. Arce, 1915, 21 N.M. 115, 152 P. 1143.

It is also urged as a ground for reversal that this action is barred by laches because of the long delay of the plaintiffs in bringing suit. So far as the record shows, the last accounting by Kendrick was in 1934. The Boardmans were then living in the western part of the state; H. J. Boardman died in 1940 and Jewell Boardman was poor, old, and infirm, with but little education or knowledge of her rights. The trial court found against appellants on this point and they have failed to convince us the holding should be overturned.

As above indicated, there is sufficient substantial evidence to sustain findings of fact made by the trial court necessary to sustain the judgment and as such findings have not been successfully attacked by the appellants the judgment will be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN, SADLER and KIKER, JJ., concur.